*413 Ruffin, C. J.
The instructions to the jury seem to be fully responsive to the prayer of the prisoner, and we do not perceive in them, as given, any error to the prejudice of the prisoner. The killing was, unquestionably, not from necessity in defence oí the prisoner’s person. Lord Hale says, that it must appear plainly by the circumstances of the case, as the manner of the assault, the weapon, or the like, that the party’s life was in imminent danger — otherwise, the killing of the assailant is not justifiable self-defence. 1 P. C. 484.
And Mr. Bast lays it down, “that a bare fear, however well grounded, that another intends to kill one, unaccompanied with an overt act, indicative of such intention; will not warrant the latter in killing the other by way of prevention ; there must he an actual danger al the time.” 1 E. P. C. 373. There was here no danger of the prisoner’s life or great bodily harm ; for the deceased had no deadly weapon, nor any means of doing the prisoner such harm, and in no manner, at the time, indicated an intention to do so, and they were nearly of the same strength. But notwithstanding the defect of evidence of any contemporaneous purpose or ability, on the part of the deceased, to kill the prisoner, the court left to the jury the enquiry of fact, whether the deceased was assailing the prisoner in a deadly manner; which the jury found against the prisoner. He has, therefore, no cause of complaint on this point. The instructions asked, are then to be considered in reference to the position, that the killing was not more than manslaughter. The prayer was, that if the deceased had threatened to take the , prisoner’s lile, which was known to him, and he gave back and the deceased, followed him, as stated by Cowan, then the killing was only manslaughter. As to the threat it must have been that proved by Grant to have been made three weeks before, as that alone was communicated to the prisoner. We do not perceive how that can mitigate the offence. If it has any effect, it tends to shew, that the killing was not on heat of blood, but both intentional and of previous purpose; and therefore it would be murder, unless, from the threats and the circumstances attending the encounter, ü *414 appear,, that it was necessary in self-defence — .which we have already seen was not so. But, notwithstanding this consideration, his Honor did beneficently put it to the ju^ that if the parties became engaged in a scuffle, during which the prisoner killed the deceased,-it would1 be but manslaughter'.
Now,- in the case of mutual combat upon words of reproach or other sudden provocation, if one of the parties takes an undue advantage, as by drawing his sword, and making an assault, before the other has an opportunity to draw his, it is settled, that it is murder.- And só here where one of the parties drew his knife without notice to the other,who expected only a fight without weapons, as the other knew, if wóuid'seem, even- if they actually engaged in the fight, that the former’s stabbing the other must be minder, for it is plain, that the slayer intended a fight as well as the other, blit he did not intend a fair fi'ght, as a trial of natural strength-, but sought the other’s blood. But in this case there was no1 actual combat prior to the mortal blow. Under the prayer and instructions we are to consider the case, as to this point, upon the testimony' of Cowan alone, laying aside that of A. Johnson and the other witnesses. Cowan states, that both of the parties were quarrelling, and that A. Johnson was trying to prevent a fight between them, when h-is attention was drawn to them ;• that he then saw the prisoner back, and the deceased follow him eight or ten steps;- that he saw no scuffl-e nor blow given by either party, ¿Uf saw the prisoner run off — which was, no doubt, immediately after giving the first fatal blow. Upon this evidence, by itself, it is-clear, that it is murder. Two men meet in the street, and, upon angry words on both sides one of thenv offers a fight and- the other retreats a- few steps,1 but without declining the fight. Instead; however] of fighting, as was expected b-y the other, without arms,-he,-that retreats, had either during the quarrel drawn his knife and meant by his ret-reat to-draw the other on, or he fell back until he could draw his knife :• and then, without warning his adversary to keep-off, and! as soon- as he got ‘within reach, and before he *415 had made a blow, he stabbed him so as with a single stroke to take his life upon the spot, and immediately fled.
The prisoner not only took an undue advantage of the deceased, but he took it, while he meant the deceased to believe, that they were to fight on an equality ; which argues, not sudden passion, but a wanton and cruel thirst for blood. If to these circumstances be added that of the deceased’s threat thr.ee weeks before, the case is rather aggravated than mitigated. For it tends to raise a presumption of a previous mutual grudge, which the one party was then seeking to gratify in an ordinary fight, and the other party to gratify fatally under the pretence of a sudden mutual combat, in which, though his adversary thought it was to be fair, he meant to take, and secretly did take, an undue and fatal advantage.
In consultation it occurred to us at one time, that the case might properly have been left to the jury favorably to the prisoner, on the principle of Levet’s Case, Oro. Car, 53S; which is, that if the prisoner had reasonable ground for believing that the deceased intended to kill him, and, under that belief, shew him, it would be excusable or at, most manslaughter, though, in truth, the deceased had no such design at the time. To that purpose the jealousy of the deceased, the previous fight in which the deceased took an undue advantage, his threat, his readiness again to quarrel and fight, and the time being night, in which the deceased might be armed without the prisoner’s discovering it, would be material. But the court is satisfied, for several reasons, that the prisoner can take no benefit from that principle. The belief, that a person designs to kill me, will not permit my killing him from being murder, unless he is making some attempt to execute his design, or, at least, is in an apparent situation to do so, and thereby induces me reasonably to think that he intends to do it immediately. Here there certainly was no such purpose then in the mind of the deceased, as he had no weapon of any sort. Nor did the prisoner have any just reason to think that the deceased so designed then ; for although it was night, yet it was bright star-light, so that *416 all the company could see each other distinctly, and the prisoner must have seen that the deceased was not armed, or , , that, at least, he did not appear to be armed. 1 he most, then, that could be made of it would be, that the prisoner-may have thought that the deceased might be armed, and, therefore, that he might then intend to kill him. But such a remote conjecture will not authorize one man to kill another. There might have been more in it, if the deceased had been-found lurking on the way of the prisoner in the dark, when he could not tell whether he was armed or not, but might presume from his ill will towards him and the situation in which he was found, that he was. But it cannot apply to a case where there is light enough for the parties to know each other, and upon a mutual quarrel they begin a fight, in which neither party appears to be armed, and one of them secretly prepares a deadly weapon, with which he assails and kills the other, who in reality was, as he appeared, not armed'.. Besides, the prisoner did not allege, in his de-fence, that he believed at the time that the deceased intended to kill him, and under that belief, that he slew him. He prayed for instructions on the allegation, that the deceased did intend to kill him, and not on the prisoner’s reasonable, though mistaken belief, that he so intended. As the prisoner alone positively knew the stale of his own mind on that point, and he did not bring forward the idea of such a belief having been entertained by him, the court and jury could not presume it. Moreover, it has often been decided, that, according to the constitution of this court, we cannot reverse a judgment, because it does not appear in the record that the verdict ought to have been given, but only for erroE apparent in the decision of the court.
Therefore, an omission, merely, to give instructions that might have been proper, if asked, is not error, but only the giving wrong instructions, or (he refusing right ones when when asked. We do not know in this case, that the Judge did not submit this enquiry to the jury; for the evidence and occurrences at the trial are not fully set forth in any case, but the appellant states only so much as is material to *417 tlic points, on which he excepts to the opinion of the Court. But at all events, it does not appear, that the prisoner pray-' ed any instructions on this point, and therefore he cannot complain of the omission. There is no error in the judgment: which will be certified to the Superior Court.